Filed 6/1/22  McCarthy v. Cal. Coastal Commission CA2/6
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| ROBERT EDWIN MCCARTHY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA COASTAL COMMISSION, <br><br> Defendant and Appellant. | 2d Civ. No. B309078 <br> (Super. Ct. No. CV130110) <br> (San Luis Obispo County) |

This appeal arises under the California Coastal Act of 1976 (Coastal Act).  (Pub. Res. Code, § 30000 et seq.)[1]  San Luis Obispo County (County) granted the property owners' application for a coastal development permit.  On appeal, the California Coastal Commission (Commission) denied the permit on the grounds that the adequacy of the on-site water well could not be determined and that the project violated visual and scenic resources policies.

_____

[1] All further statutory references are to the Public Resources Code unless otherwise stated.

The property owners petitioned for a writ of administrative mandate. The trial court denied the writ, but found that the Commission's determination of the adequacy of the water well was not supported by the evidence. Both parties appeal. We affirm the denial of the writ and reverse the trial court's finding as to the adequacy of the water well.

FACTS

Robert and Judith McCarthy, individually and as trustees of family trusts (the McCarthys), own a 37-acre parcel in an unincorporated portion of the County. The parcel is in the coastal zone and subject to the County's local coastal plan (LCP). The parcel is on a ridge facing the ocean and sits directly above a public coastal access way.

The LCP delineates an urban services line. The LCP prohibits water service extensions outside of the line without an LCP amendment. The McCarthys' property is located outside of the line and there is no public water utility service to the property.

*The Project*

The McCarthys sought authorization to construct a 5,500-square-foot single family residence and a 1,000-square-foot secondary residence located above a 1,000-square-foot detached garage. The site improvements the McCarthys sought include grading and paving of an access road, a 10,000-gallon water tank for fire suppression, and an extension of a water line to deliver water from County Service Area 12 (CSA-12).

*Application to County*

In 2010, the McCarthys applied to the County for a coastal development permit for their project. In July 2011, the County approved the McCarthys' permit application subject to conditions.

2.

The permit allowed the extension of water lines for public water service to the project from CSA-12.

*Appeal to Commission*

Two commissioners appealed the County's permit approval to the Commission. The appeal alleged that the permit violates the LCP in providing water service outside of the urban services line; in violating visual and scenic standards; in potentially violating archaeological resources standards; in potentially violating geologic hazard standards; in violating the environmentally sensitive habitat standards; and in violating public access policies.

The McCarthys filed a claim with the Commission alleging that they have a vested right to water service from CSA-12 that predates the Coastal Act, and thus their right to water service from CSA-12 is not subject to the Coastal Act. At the request of the McCarthys, the Commission agreed to hear the vested right claim and the permit appeal at the same hearing.

The Commission staff recommended that the Commission deny the McCarthys' vested right claim. The staff determined that neither the existence of a contract between CSA-12 and the County's flood control and water conservation district nor the coastal development permit from the County gave the McCarthys vested rights. The McCarthys did not undertake substantial work and incur substantial liabilities in reliance on governmental permits prior to the Coastal Act.

The staff recommended that the Commission approve the coastal development permit subject to conditions, including that water be provided by an on-site well instead of by CSA-12.

3.

After a hearing, the Commission voted to deny both the McCarthys' claim to a vested right to water service and their application for a coastal development permit.

Because the staff's recommendation to approve the permit application was rejected by the Commission, the staff submitted proposed revised findings. The revised findings were: (1) The project has no public water supply and the reliability of the on-site water well has not been established. The proposed project cannot be approved because it does not have "a clearly established LCP-consistent water supply." (2) The visual impact of the project on public places violates the LCP visual and scenic resources policies.

In response to objections by the McCarthys, the staff presented amended findings to the Commission. But the amendments did not change the substance of the findings. The Commission adopted the findings as amended.

*Writ Petition and Complaint*

The McCarthys' petition and complaint alleged eight causes of action. The first five causes of action petitioned for a writ of administrative mandate to overturn the Commission's decision on denying the McCarthys' vested rights claim and denying their permit application. The remaining causes of action allege violation of the Bagley-Keene Open Meeting Act, inverse condemnation, and declaratory relief.

The McCarthys dismissed without prejudice the fourth cause of action alleging denial of a fair hearing and the sixth through eighth causes of action. The trial court denied the McCarthys' petition as to the remaining first through third and fifth causes of action.

In denying the writ causes of action, the trial court determined that the Commission's findings that the project violated the LCP's public works and visual and scenic resources policies are supported by substantial evidence. Although it did not affect the result, the court also determined that the Commission's finding relating to the suitability of the McCarthys' on-site water well was not supported by substantial evidence.

DISCUSSION

I

*Statutory Background*

The Coastal Act requires a local government to prepare an LCP for development in the coastal zone within the local government's jurisdiction. (§ 30500.) Once the local government prepares an LCP, it must be certified by the Commission as being in compliance with the Coastal Act. (§ 30512.) After the LCP is certified, a party seeking to develop land within the coastal zone must apply to the local government for a coastal development permit. (§§ 30600, subd. (a), 30519, subd. (a).) The local government can issue a coastal development permit only if the proposed development conforms to the LCP. (§ 30600.5, subd. (c).)

The local government's action on an application for a coastal development permit may be appealed to the Commission by the applicant, any aggrieved person, or any two members of the Commission. (§ 30625, subd. (a).) The Commission must provide a "de novo public hearing" on the appeal. (§ 30621, subd. (a).) The grounds for appeal are limited to whether the proposed development conforms to the LCP and with the Coastal Act's public access provisions. (§ 30603, subd. (b).) After the public

5.

hearings, the Commission may approve, modify, or deny the proposed development. (§ 30625, subd. (a).)

## II

### *Standard of Review*

Judicial review of the Commission's decision is by writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5. (§ 30801.) The questions on review are whether the Commission proceeded in excess of its jurisdiction and whether it abused its discretion. (*Lindstrom v. California Coastal Com.* (2019) 40 Cal.App.5th 73, 93.) In determining whether the Commission abused its discretion, we review the entire record in a light most favorable to the Commission. (*Ibid.*) We uphold the Commission's decision if any reasonable person could have reached the same decision. (*Ibid.*)

### THE MCCARTHYS' APPEAL

## III

### *The Commission's Timely Action on the Project*

The McCarthys contend the project has been approved by operation of law because the Commission failed to act on the project within 21 days as required by sections 30622 and 30625, subdivision (a).

In fact, the Commission acted to deny the McCarthys' application for a coastal development permit within the 21 days required by section 30625, subdivision (a). The McCarthys' contention that the Commission failed to act on "the project" is based on their own definition of "the project." The McCarthys contend the Commission was required to consider the project only as it was approved by the County; instead, the Commission considered the project as proposed by its staff. From this, the

6.

McCarthys conclude that the Commission did not consider the project.

But the McCarthys' conclusion is based on the false premise that the Commission is required to consider the project only as it was approved by the County. It is well established that the Commission hears the permit application as if no local government was previously involved. (*Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569.) The hearing " 'is in no sense a review of the hearing previously held, but it is a complete trial of the controversy, the same as if no previous hearing had ever been held.' " (*Ibid.*, quoting *Collier & Wallis, Ltd. v. Astor* (1937) 9 Cal.2d 202, 205.) Thus, the Commission is entitled to consider all relevant information, including the report and recommendations of its staff. The Commission is not limited to considering the project as approved by the County. For purposes of the appeal to the Commission, the County's approval does not exist.

The Commission voted to deny the McCarthys' application for a coastal development permit. That denial includes the project as originally proposed by the McCarthys, the project as approved by the County, and the project proposed by the staff. The denial means the McCarthys have no permit to proceed with any project in any form. The denial, having been made on the date of the hearing, is well within the 21 days of the hearing required by the Coastal Act. But all is not lost for the McCarthys. If the McCarthys wish to proceed in the future with a project that complies with the LCP, they can reapply.

IV

*Revised Findings*

The McCarthys contend the revised findings fail to reflect the grounds for denial of the permit.

When the Commission takes action that substantially differs from the staff recommendations, the staff must prepare proposed revised findings. (Cal. Code Regs., tit. 14, § 13096, subd. (b).) The Commission votes on whether to adopt the proposed findings at a public hearing. (*Id.*, subd. (c).) Here the Commission voted to adopt the proposed revised findings.

First, the McCarthys argue the revised findings are not accurate because the Commission took no action on the County-approved project. But as we explained, the Commission considers the matter de novo as if there were no County-approved project.

Second, the McCarthys challenge the revised findings on the adequacy of the on-site water well as a post hoc rationalization for denying the permit. But as we discuss under the Commission's appeal, there is more than an adequate basis for the Commission's conclusion that the suitability of the well could not be determined. The conclusion was not simply a post hoc rationalization.

The McCarthys argue that the Commission did not specifically mention some of the problems with the on-site water well at the hearing. But there was an extensive general discussion on the adequacy of the well as a water supply and what may result if it failed.

Moreover, the McCarthys cite no authority that the findings must reflect only the discussions at the hearing. The test is whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's

8.

decision.  (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.)  The McCarthys cite no requirement that the Commission discuss at the hearing all the evidence on which it relies.

Finally, the McCarthys claim that the revised findings fail to satisfy the requirement in *Topanga Assn. for a Scenic Community v. County of Los Angeles*, *supra*, 11 Cal.3d at page 515; that the findings provide the necessary specificity to bridge the analytic gap between evidence and final action.

Here the revised findings cover 41 pages of the administrative transcript exclusive of exhibits.  They are finely detailed.  The revised findings are more than adequate to bridge the analytical gap between the evidence and the Commission's decision.

The McCarthys claim the findings contain a misstatement: that they (the applicants) did not accept a risk of well failure.  They fail to cite to a place in the record where the alleged misstatement can be found.  If the statement exists, we have not found it.  In fact, the revised findings state, "It appears the applicants may be agreeing to use the on-site well on a temporary basis to serve the development while continuing to pursue an extension of water services in the future."  That statement accurately reflects statements made by the McCarthys' representative at the hearing.  The revised findings also state, "[T]he commission could condition a permit to require that the [McCarthys] assume all risks for the well and its use (and only its use) for the life of the project . . . ."  Whether the McCarthys want to accept the risk of well failure is irrelevant.  It can be made a condition of the permit.

9.

# V
## *Visual Impacts*

The McCarthys contend the project as recommended by the Commission staff does not result in adverse visual impacts to LCP-protected viewsheds.

The revised findings state, in part:  "The approved project does not conform to the LCP's visual policies at the most basic level because its scale and style are not subordinate to and not consistent with the rural undeveloped hillside character of the area and it will significantly degrade the public viewshed, including particularly with respect to views associated with the popular Pirates Cove accessway area."

The Commission relied on the LCP Visual and Scenic Resources Policies 1, 2, 4, and 5 and the Coastal Land Use Ordinance (CZLUO) sections 23.04.210 and 23.07.164(e).

Policy 1 requires unique and attractive features of the landscape, including scenic vistas and sensitive habitats, to be preserved.  Policy 2 requires permitted development to be sited to protect views to and along the ocean.  Policy 4 requires new development to be designed, including height, bulk, and style, to blend with the rural character of the area.  Policy 5 requires contours of finished surfaces to blend with the natural terrain.

CZLUO sections 23.04.210 and 23.07.164(e) provide standards for preserving views in critical viewsheds and sensitive resource areas.

### *(a) Application of Policy 1*

The McCarthys argue that Policy 1, requiring the protection of scenic vistas, does not apply.

The McCarthys point out that the revised findings rely on chapters 6 and 7 of the LCP in the application of Policy 1 to their

10.

project.  Chapters 6 and 7 designate Ontario Ridge, where the project is located, as a sensitive resources area.

The McCarthys rely on a sentence from the introduction to the LCP stating, "The text of this report, other than Chapter 8, is for general planning guidance only and is not to be used as a basis for approval or disapproval of development or land division proposals."

The sentence is puzzling.  A land use plan that cannot be used as a basis for the approval or disapproval of a proposed development is not a plan at all.  In addition, the sentence is ambiguous.  It refers to "[t]he text of this report."  It is not clear to what it is referring.  An LCP is not usually referred to as a report.  The McCarthys point to nothing in the text of chapters 6 and 7 or elsewhere in the LCP that would support their argument.

Moreover, the interpretation given to the sentence by the McCarthys would violate the Coastal Act.  (§ 30500.)  When the Legislature required local governments to prepare an LCP, we assume it meant a meaningful LCP.  It did not intend a single ambiguous sentence in the introduction to render entire chapters meaningless and leave large swaths of the coast unprotected from development.  Nor did the Commission so intend when it approved the LCP.

Whatever the sentence on which the McCarthys rely might mean, it does not prevent the Commission from denying their project

*(b)  Application of CZLUO Sections*

The McCarthys contend that CZLUO sections 23.04.210 and 23.07.164(e) do not apply.  They cite a provision from the County's Coastal Plan Policies.  The provision states:  "Many

policies have been implemented in applicable ordinances. Each individual numbered policy will state where it has been implemented. When a policy has been implemented in ordinance, the ordinance shall prevail in case of conflict with the policy."

The McCarthys interpret the provision to mean that for the standards in a CZLUO section to apply, the CZLUO section must be cited in the policy. But that is not what the provision says. The purpose of the provision is to clarify that where a policy has been implemented in an ordinance, and there is a conflict, the ordinance prevails. The provision states, "Each individual numbered policy will state where it has been implemented." In context, it appears "will state" is more of a statement of fact than a mandate. It makes it easier to correlate a policy with a particular ordinance. But nowhere does the provision say the failure to so state results in the ordinance being inapplicable. There is no reason to interpret the provision as having such a drastic effect, particularly where, as here, there is no conflict between the policy and the ordinance.

Again, as above, the McCarthys take a single sentence from a complex document – "Each individual numbered policy will state where it has been implemented" – and argue it must be interpreted so as to defeat a clearly stated policy. The LCP and related documents are not perfectly drafted. But they clearly and unequivocally state a policy for preserving scenic views. We cannot take isolated sentences from such documents and interpret them in ways that defeat a clear and unequivocal policy. The paramount purpose of the Coastal Act is to preserve coastal resources. We must interpret the LCP in ways that promote, not frustrate, that purpose.

*(c) Impact on Public Views*

The McCarthys contend their project does not impact a public view corridor.

LCP Policies 2, 4, and 5 protect "public view corridors." The McCarthys point out that the LCP does not define "public view corridors," but it does designate specific sites as public view corridors. Ontario Ridge, where the McCarthys' property is located, is not so designated. The McCarthys conclude that Ontario Ridge is not a public view corridor.

But the LCP does not state that only designated sites can be considered public view corridors. It is true that the LCP does not give the Commission a blank check to designate just any area as a public view corridor. But here the Commission had more than ample evidence to support that designation.

The project is a 5,500-square-foot multiple story residence with a 1,000-square-foot residence above a detached garage. The McCarthys provided photo-simulations and artist renderings showing the project from various viewpoints. Commission staff viewed the site on numerous occasions and from various vantage points. The project would be constructed on a hillside that forms a major scenic backdrop for the coastal area of Avila and Pismo beaches. It would be visible from numerus public areas including the Pirates Cove parking and overlook areas, the public trail between Avila Beach and Pismo Beach, as well as other public trails and Cave Landing Road. More distant views would include the Avila Beach Pier, various areas within Port San Luis, and Palisades Park.

The McCarthys do not contest the evidence.

The McCarthys point to the definition of "[s]cenic corridors" in the County's general plan. It defines them as "view areas, or

13.

'viewsheds' from popular public roads and highways that have unique or outstanding scenic qualities." The general plan lists the scenic roads and highways. The McCarthys argue their property is not visible from any of the designated roads or highways.

The argument has several flaws. First, the terms "scenic corridors" and "public view corridors" are not the same. "Scenic corridors" are limited to highways and roads. "Public view corridors" are not so limited. The term "public view" indicates any view from a public place.

Second, the Commission is limited to determining whether the project complies with the LCP. (§ 30603, subd. (b).) It certifies only the LCP, not the general plan. (§ 30512.)

Third, the general plan provides that in the event of a conflict, the LCP prevails.

*(d) Rural Character*

The McCarthys contend Policy 4, requiring that development in rural areas blend with the rural character of the area, does not apply because their property is not in a rural area.

The McCarthys point out that the LCP states, "The rural area includes all lands outside of the urban reserve lines for Avila Beach . . . ." They also point to the definition of "rural area" contained in the County's CZLUO as "[a]ny area or land use category outside of the urban or village reserve lines established by the [land use element of the general plan]." The McCarthys' property is inside the urban reserve lines for Avila Beach.

But Policy 4 refers to "rural areas" only in its heading. The text of the policy provides, in part, "***Visual and Scenic Resources Policy 4 – New Development in Rural Areas***. New development shall be sited to minimize its visibility from public

14.

view corridors.  Structures shall be designed (height bulk style) to be subordinate to, and blend with, the rural character of the area."

The purpose of the policy is to protect public views by requiring structures to blend with "the rural character of the area."  An area may have a "rural character" even though it does not fall within the technical definition of a "rural area."  In interpreting a numbered policy stated in the LCP, the purpose and text of the policy must prevail over the heading.

Here the County designates the McCarthys' property as "rural residential."  The McCarthys own permit application describes the land surrounding their property as "vacant."  Aerial photographs accompanying the application show the property as rural in character.  Commission staff, who have viewed the property a number of times, determined that the property is rural in character.  There is an abundance of evidence to show the "rural character of the area" in which the McCarthys' property is located.

The McCarthys argue the Commission's reliance on the County's designation of their land as "rural residential" is misplaced.  They point out that there is a separate zoning designation for "rural lands."  The "rural lands" designation is related to agriculture.  But the County designated the McCarthys' parcel as "residential rural."  It is irrelevant that there is another designation for "rural lands" relating to agriculture.

VI

*Adequacy of On-Site Water Well*

The Commission contends the trial court erred in determining that the Commission's finding relating to the suitability of the on-site water well was not supported by substantial evidence.

Ordinarily, when a project depends on an on-site water well, the County would have reviewed the on-site well's suitability as part of its approval process. In this case, however, the County's approval of the McCarthys' development permit was based on extending public water service lines to the McCarthys' property. Thus, it was left to the Commission to review the suitability of the well in the first instance.

The Commission did not find the water well was unsuitable. Instead, it found only that the well's suitability could not be determined from the record.

The LCP Public Works Policy 1 provides, in part: "New development . . . shall demonstrate that adequate public or private service capacities are available to serve the proposed development." Thus, the burden is on the McCarthys as the proponents of the new development to demonstrate that their on-site water well is suitable for their project. The Commission's finding that the suitability of the well could not be determined is simply another way of saying that the McCarthys failed to carry their burden of proof.

The Commission is concerned not only with the suitability of the water well in the short term, but also with the viability of the well for the life of the project, many decades into the future. The fear is that should the well fail, it will pressure the County to

extend public water lines into the area, leading to more intense development.

At the hearing, the McCarthys' representative stated that the McCarthys would accept a permit with use of the on-site well as a condition, but they would continue to seek the extension of public water lines to their property. The Commission could take that as an admission that the long-term viability of the well is at least questionable. That admission alone is sufficient to support the Commission's finding.

In addition, the revised findings state that the well was tested in May 2010. As to quantity, it produced 20 gallons per minute, which exceeds the County's requirements for a single-family residence. But the McCarthys submitted no recovery data to verify the results. As to quality, the revised findings stated that the water had not been tested for the presence of cyanide and that the test results for coliform bacteria simply indicated it is present without specifying how much.

Those findings are supported by a letter from the County Health Agency to the McCarthys' planning consultants commenting on its "initial review of the submitted well documents." In fact, the findings are based directly on the letter.

The McCarthys challenge the findings as not based on fact.

As to the lack of recovery data from the well pump test, the McCarthys point out that the County's letter states, "This office would expect that the hydrogeologist who performed the testing would have this data available and that it was simply omitted from the summary provided to this office."

The well recovery data makes it possible to accurately determine the flow rate of the well. That the hydrogeologist who performed the pump test may have this information is of no help.

The Commission can only decide on the information presented to the Commission. Without the recovery data, the Commission was justified, indeed compelled, to conclude the suitability of the well could not be determined. The McCarthys argue that the presence of coliform bacteria requires no further testing. They refer to the County's letter as requiring no more than the addition of chlorine and an inspection of the surface of the well for structural problems. But that is not what the letter says. The letter says, "Prior to consumption or extended contact with the well water, a confirming Bacteriological test should be performed."

The McCarthys argue the well was tested for cyanide. That appears to be true. But the other gaps in the testing support the Commission's decision.

The McCarthys also point out that the County's letter concluded that the well is suitable for residential use. But the Commission is not bound by that finding. (See *Kaczorowski v. Mendocino County Bd. of Supervisors*, *supra*, 88 Cal.App.4th at pp. 569-570.) In fact, given the gaps in information, one wonders how the County could have reached that conclusion.

In order to reverse the Commission's decision, the McCarthys must show that no reasonable person could have reached the same conclusion. (*Greene v. California Coastal Com.* (2019) 40 Cal.App.5th 1227, 1235.) Here the state of the record shows the Commission could not have reasonably reached any conclusion other than the one it reached. The McCarthys point to no evidence that would compel the Commission to conclude the McCarthys carried their burden of demonstrating that the well is adequate to serve their property for the life of the project.

18.

## DISPOSITION

The trial court's ruling on the suitability of the on-site water well is reversed.  In all other respects, the judgment is affirmed.  Costs are awarded to the Commission.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.

Martin J. Tangeman, Tana L. Coates, Judges

Superior Court County of San Luis Obispo

_____

Nossaman, John J. Flynn III, Gregory W. Sanders, and David J. Miller for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Daniel A. Olivas, Assistant Attorney General, and Andrew M. Vogel, Deputy Attorney General, for Defendant and Appellant.